## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| TAMI L. YEUTTER, | ) | CASE NO. 7:05CV5011 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the appeal taken by Tami L. Yeutter, Plaintiff, of the final decision of the Commissioner of the Social Security Administration, Jo Anne B. Barnhart, Defendant (hereafter "Commissioner.")

### PROCEDURAL BACKGROUND

The Plaintiff, Tami Yeutter, filed her initial application for benefits under Title II on August 7, 2003, and for Title XVI benefits on December 29, 2003. (Tr. 68-70; 17). The claims were denied initially (Tr. 27-28) and upon reconsideration. (Tr. 29-30). An administrative hearing was held before Administrative Law Judge ("ALJ") Ronald D. Lahners on November 4, 2004. (Tr. 455-503). On December 23, 2004, the ALJ issued a decision finding that Yeutter was not "disabled" within the meaning of the Act and therefore is not eligible for disability benefits. (Tr. 14-24.) Her request for review by the Appeals Council was denied. (Tr. 8-10). Yeutter now seeks judicial review of the ALJ's determination as the final decision of the Commissioner. (Filing No. 1.)

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

## ISSUES ON APPEAL

Yeutter identifies five issues on appeal.  First, Yeutter claims that the ALJ failed properly to analyze which impairments, of the impairments the ALJ identified, existed independent of her alcohol abuse and the extent to which those are disabling to Yeutter. Second, Yeutter argues that the ALJ's finding, that her psychological impairments were exacerbated by her alcohol use, was not dispositive of whether Yeutter's alcohol abuse was "material" to her disability.  Third, Yeutter contends that the ALJ's conclusion, that her mental functional limitations would significantly improve if she stopped using alcohol, conflicts with the opinions of Yeutter's treating sources whose primary diagnosis is bipolar disorder and who have observed that Yeutter uses alcohol to self-medicate.  Fourth, Yeutter contends that the ALJ erred in relying upon the VE's answer to an incomplete hypothetical question.  And last, Yeutter contends that the ALJ ignored her Global Assessment of Function ("GAF")[1] scores between 40 and 50.  (Filing No. 18, at p. 4).

## FACTUAL BACKGROUND

Yeutter alleges that she had been unable to work since October 25, 2002, when she was 42 years old.  (Tr. 68).  Yeutter alleges that she suffers from depression, bipolar disorder, and panic attacks, which prevent her from maintaining sustained employment. (Tr. 83).

---

[1]The GAF score is used to measure social, occupational or school-related functioning.  A score in the mid-60s to 70 generally reflects mild to moderate symptoms and some mild to moderate difficulty in social, occupational, or school functioning, but generally stable functioning with some meaningful interpersonal relationships. (DSM - IV- TR, (4th ed. p. 34)).  A score of 40-50 reflects a low level of functioning.  *Id.*

### Documentary Evidence Before the ALJ

Yeutter received her primary medical treatment at Midlands Family Medicine (Tr. 202-43, 322-51), where she was treated primarily by a nurse practitioner, Mary Dailey, who worked under the supervision of Jeffrey Brittan, M.D. (Tr. 233). In a note dated April 29, 2002, Dailey authorized refills of Wellbutrin, and Zoloft, both of which are used to treat depression and certain anxiety disorders. She noted that Yeutter was "now a foster mother of 3 children and seems to be thriving in that situation." (Tr. 213). That positive outlook had changed by October 2002. In Dailey's notes dated October 7, 2002, Yeutter reported that her depression was increasing due to difficulties at home with her foster children and with their natural mother. (Tr. 211). Dailey changed Yeutter's primary anti-depressant medication from Zoloft to Lexapro, 20 mg. (Tr. 211). On December 5, 2002, Dailey noted that the new medication helped Yeutter "significantly." (Tr. 209).

Yeutter was diagnosed on March 28, 2003, with bilateral carpal tunnel syndrome. (Tr. 197-98). A right carpal tunnel release surgery was performed in May 2003, and a left carpal tunnel release surgery was performed in June 2003, by orthopaedic surgeon Patrick McGrath, M.D. (Tr. 197-99; 272-78).

On July 21, 2003, Dailey's notes indicate that Yeutter was "very, very sad" and "very, very tearful." (Tr. 204). A week before, she had been seen complaining of feeling fatigued and tired. She was tested for West Nile virus, and records from August show the test came back positive. Dailey doubled Yeutter's dosage of Lexapro, to 40 mg, and checked her depression the next day. (Tr. 203).

On August 12, 2003, Dailey noted that "she has been drinking," referred Yeutter to her AA sponsor, and warned that she did not want Yeutter taking anti-depressants if she

3

continued to drink.  (Tr. 202).   On August 15, 2003, Dailey noted that Yeutter still had some depression.  (Tr. 336).   In October 2003, Dailey's notes indicate that Yeutter's anxiety level was up because her foster son had run away, and medications were adjusted. (Tr. 335).  In November 2003, Dailey noted that Yeutter was experiencing a period of mania – and that her blood pressure was up and down. Yeutter was treated for cold symptoms in late November (Tr. 332-33).

Yeutter was also seen by Vicki Dugger, LMHP, a counselor at Lutheran Family Services from August 18, 2003, through July 29, 2004.  (Tr. 263–64, 352-424).  In a report covering the period from August 18, 2003, through October 19, 2003, Yeutter had weekly counseling sessions with Dugger.  In her report on these sessions, Dugger assessed Yeutter as having post-traumatic stress disorder of an early onset; and bipolar disorder, moderate, with psychotic features.  Dugger did not mention alcohol abuse or dependence. She assigned a GAF score of 65 in October 2003. (Tr. 264).

Yeutter was seen by a state agency consultant, Rebecca A. Schroeder, Ph.D., on October 7, 2003, in conjunction with Yeutter's application for benefits.  (Tr. 244-52). Yeutter related that she had lost her job in October 2002 at Armadillo Transport Company after employees complained about her.  (Tr. 246).  She related a family history of mental illness, including bipolar disorder and schizophrenia.  (Tr. 245).  She also reported her educational background and history of substance abuse, and noted that her substance abuse interacted with her mental health functioning.  (Tr. 247). Yeutter stated that she had not used any illegal substance since 1991, and she "continued to drink alcohol,"  but she described herself as an "occasional" drinker, noting that she had been "drunk" twice in the

4

last year.  (Tr. 248).  Yeutter told Dr. Schroeder that she had abused the prescription drug

Ativan.  (Tr. 248).

Yeutter had no difficulty responding to simple or complex questions during the

evaluation.  (Tr. 249).  The psychologist noted that throughout the session, Yeutter's mood

seemed "euthymic, just slightly euphoric," she didn't seem to be overly tense or anxious,

and she did not appear to be under the influence of any substance. (Tr. 250).  The

psychologist recorded her impressions:

> [Yeutter] reports as having a diagnosis of a bipolar disorder.  This disorder
> seems to be an appropriate one for the client as she does continue to show
> symptoms of a bipolar process.  Presently, she does seem to be in a manic
> episode as was evidenced by her speech and her mood.  Over the years, the
> client also has had longstanding substance abuse issues.  She appears to
> have tried to self-medicate herself at times.  However, over the last 10 years,
> she has not used any illegal substances.  She has, however, at time abused
> prescription medications, and at other times, has used alcohol.  She does
> continue to abuse alcohol on occasion.  The client does seem to have fairly
> good insight into her symptomology and into her need for therapy . . .  As
> long as she is not in a manic episode.

(Tr. 250).

Dr. Schroeder diagnosed the following:

| | | |
|---|---|---|
| Axis I | Bipolar disorder, most recent episode mixed, moderate; alcohol abuse on occasion; and polysubstance dependence by history; | |
| Axis II | Personality disorder (NOS); | |
| Axis III | West Nile virus, high blood pressure, high cholesterol | |
| Axis IV | moderate stressors including taking care of children in her home; | |
| Axis V | A current GAF of 70, with a past year high of 71. | |

(Tr. 251).  The psychologist opined that Yeutter would not have problems understanding,

remembering, and carrying out short and simple instructions most of the time and that she

5

seemed able to relate appropriately to co-workers and supervisors.  (Tr. 251).  On the other hand, the psychologist found that Yeutter had some trouble in sustaining concentration and attention needed for task completion, and that she seemed to have difficulty sitting still especially when she was in a manic episode.   (Tr. 251).   The psychologist found that Yeutter had trouble handling stressors, and when under stress, there was exacerbation of her moods of depression and mania.  The psychologist noted that Yeutter has "some trouble in keeping her mood stable even with medication" and that "these types of problems likely do interfere with her activities of daily living."  (Tr. 251).

On November 7, 2003, a state agency psychiatrist, Patricia Graham, prepared a report, although it is not clear whether Dr. Graham actually examined Yeutter in person. Dr. Graham reviewed documents from the file, including statements made by Yeutter, the counseling records of Vicki Dugger, the medical records from Midlands Family Medicine, a psychiatric evaluation from 2000, and the report prepared by Dr. Schroeder.  Based on all the information, Dr. Graham made the following findings: that Yeutter is credible; and that Yeutter has severe impairments of Bipolar Disorder, Depressed, Personality Disorder (not otherwise specified), and Alcohol Abuse.  (Tr. 179-80).  Dr. Graham's report was reviewed by another physician who affirmed her report on March 2, 2004.  (Tr. 181).

Approximately one month after Dr. Schroeder's evaluation, Yeutter was seen in the emergency room on November 14, 2003, after a "conflict with her teacher."[2]  (Tr. 257). Ayman Fareed, M.D., admitted her to the hospital's "Partial Program" for ten days.  (Tr. 260).  He diagnosed bipolar affective disorder, poly-substance abuse in remission, and

---

[2] At the time, Yeutter was enrolled in an auto mechanics class.

6

alcohol dependence in remission.  (Tr. 258-59).  Her GAF score on admission was 40 to 45 and at discharge was 45 to 50.  (Tr. 259).  Yeutter's anti-depressant medications were adjusted.  (Tr. 256).

A physical, not mental, functional-capacities evaluation was performed by a state agency physician, Dr. Hohensee, on November 20, 2003,  and he found that Yeutter had been diagnosed with carpal tunnel syndrome and mild lumbar spondylolisthesis. (Tr. 176). Among his other findings, that included lifting restrictions, Dr. Hohensee determined that Yeutter should avoid chronic repetitive hand manipulations. (Tr. 171).

 Yeutter followed up with Dr. Fareed on December 17, 2003, and she reported that she was doing fine, and she was not experiencing anxiety.  (Tr. 261).  Her medications were continued.  (Tr. 261).

On February 23, 2004, Yeutter's counselor, Vicki Dugger, noted she "has been using for days" and "Detox - AM."  (Tr. 401).  On the same day, Nurse Practitioner Dailey's records state that Yeutter was "back drinking again" and "now she is really depressed." (Tr. 330).  Based on the notes from Dugger, it appears that in the days leading up to February 23, 2003, Yeutter was having difficulty managing the care of her foster children and her own educational goals. (Tr. 400-409).  Yeutter was still drinking on February 24, 2004, and Dugger's notes from that day state "Dr. Brittan wants the kids out of the home[,] drinking."  (Tr. 399).

The following day, on February 25, 2004, Yeutter was admitted to the hospital for her increased symptoms associated with bipolar disorder, feelings that she was not safe, and relapse on alcohol.  Dr. Fareed admitted Yeutter to Great Plains Regional Medical Center with a diagnosis of bipolar disorder, substance abuse in remission, and alcohol

7

dependence (Tr. 284). In the Psychiatric Diagnostic Evaluation, Dr. Fareed noted that Yeutter reported that over the past month she had been drinking every day, including shots of tequila, and that she could not stop, which increased her feelings of depression and anxiety. She agreed to participate in the partial hospitalization program that included outpatient detox. (Tr. 286-88). Dr. Fareed also noted that she had been maintained on medications for bipolar disorder and had been stable (Tr. 286). She was discharged from the partial program on March 5, 2004.

On March 1, 2004, Dailey was reluctant to prescribe medications because Yeutter was "drinking along with her psycho tropic drugs." (Tr. 329). Yeutter began a detoxification process. (Tr. 284). She was discharged on March 5, 2004, and was advised to follow-up with Dr. Fareed, take her medications, see her counselor weekly, and attend AA meetings. (Tr. 285).

Once again, Yeutter participated in the hospital's Partial Program from March 17, 2004, to March 26, 2004. (Tr. 290-95). She did not have any drinks over the days leading up to her discharge, and "her depression lifted up." (Tr. 290). She was prescribed Antabuse. (Tr. 290).

On May 14, 2004, Ms. Dailey noted that Yeutter "looks much better" and had a good attitude. (Tr. 325). She was bright and alert. (Tr. 325). On June 10, 2004, she was not drinking. (Tr. 324).

Yeutter was again admitted to the hospital by Dr. Fareed on June 22, 2004, after stating that she was depressed and suicidal. (Tr. 297-307). Her foster children had been removed from her care on June 18, 2004. (Tr. 476). She was drinking again. (Tr. 297). She had been "struggling with alcohol most of her life." (Tr. 299). Another detoxification

8

program was started.  (Tr. 297).  Upon discharge on June 28, 2004, she was to attend an alcohol relapse prevention group.  (Tr. 298).  Yeutter entered a partial hospitalization program through July 12, 2004.  (Tr. 309-14).  She improved and her mood became brighter, and she denied suicidal ideation. (Tr. 309).  At the time of discharge, her alcohol dependence and Ativan abuse were in "early full remission." (Tr. 310).

In a report dated October 20, 2004, Dr. Fareed indicated that Yeutter had a diagnosis of bipolar affective disorder and alcohol abuse, noting that she had been "clean and sober for over a month now." (Tr. 427).  He stated that she "may not be able to work at the present time because of her mental illness." (Tr. 427).  In a report dated October 28, 2004, counselor Dugger stated that Yeutter had a GAF of 53.  (Tr. 425).  Dugger stated that Yeutter had a depressed mood most days, and that her mental health issues had "become increasingly worse over the last year." (Tr. 426).  Dugger did not mention alcohol abuse or dependency in the report.

### Plaintiff's Testimony

Yeutter appeared and testified at an administrative hearing on November 4, 2004. (Tr. 455-503).  She last worked in 2002.  She was discharged from her full-time job driving a van that took railroad employees from one location to another in March 2002.  (Tr. 463). She was terminated because someone "made up a pretty vicious lie about me to get me fired." (Tr. 463).  She indicated that she worked part-time after that through October 2002, and that she was still technically "on-call" for this job, although the employer never called. (Tr. 464).  Yeutter applied for two jobs after that but did not get them.  (Tr. 464).

Also in 2002, Yeutter took into her home three foster children.  The children's natural mother, who had been Yeutter's co-worker, was incarcerated and their father was

9

deceased.  One of the children, a teen, came to her on February 3, 2002, and two younger children came to her on March 19, 2002.  (Tr. 488).  The older child ran away and was placed at Boys Town, sometime in 2003, and the two younger children were removed from her home on June 18, 2004.  (Tr. 418, 488-89).  Upon questioning by her attorney at the hearing, Yeutter explained that her counselors have told her that she gave the children her best care, and that it was time to let go of them.  (Tr. 489).

Yeutter described having arthritis in her hips, and back problems.  (Tr. 472).  She was on pain medication for her hip pain, which she took two or three times per week.  She described her physical pain as a 7 on a scale of 1 to 10 with 10 being the greatest.  (Tr. 475).  She was primarily treated by Nurse Practitioner Dailey, whose work was supervised by Dr. Brittan, and she was referred to a psychiatrist, Dr. Fareed, about once a month for medication checks.  (Tr. 472).  She acknowledged that her medications were changed frequently.  (Tr. 473).

Yeutter described having good days and bad days, and said that she had about one good day per week.  She described her mental pain as "just feeling confused and lost and not able to handle anything. . . .  You can't function. . . . there are days I don't even leave the house because the mental pain is so bad. . . . I just get a fear of being around people . . . If something stressful happens [at home], I just try . . . to sleep a lot. "  (Tr. 476-77; see also Tr. 478-83).  When she had a panic attack, she described feeling as if she could not breathe; she was unable to respond to people; and she wanted to run away and hide.  If she was at home, she went to bed and slept.  (Tr. 484).  On good days, she stated that she used her computer to read the news and play games. (Tr. 482).

10

The ALJ questioned Yeutter concerning her history of substance abuse. She admitted that she had a continuing problem with alcohol. (Tr. 483). When asked if she was drinking "right now" she stated that she had a beer "a couple days ago" and maybe had "a beer" each month. (Tr. 483). When she was having problems with her foster children, she stated there were times when she was "drinking, you know, kind of on a regular basis." (Tr. 483). She generally did not drink beer because she was "kind of into hard liquor." (Tr. 483). Yeutter stated she started and stopped drinking a few times in early 2004. (Tr. 487). Upon questioning from the medical expert, Yeutter stated that her November 2003 problems were not related to alcohol abuse. Rather, Yeutter stated that she was very manic in November 2003, but was not using alcohol at that time, and she opted for hospitalization so that she could see the psychiatrist right away. (Tr. 487-88).

**Medical Expert Testimony**

Thomas England, Ph.D., a clinical psychologist licensed in Nebraska, appeared as a medical expert ("ME") at the request of the ALJ. (Tr. 489). He began his testimony by clarifying that, before the hearing, he had understood the onset date to be in October of 2003, rather than October of 2002, but that he had taken note of treatment that Yeutter received prior to 2003. At the hearing, he testified that it was his impression that before October 2003, Yeutter was fairly stable. (Tr. 490). Dr. England acknowledged, on cross-examination with reference to the records from 2002 and 2003, that Yeutter was being treated for depression and that Dailey was adjusting medications "in an attempt to control the depression." (Tr. 498). The ME recognized that Yeutter had impairments under Listing "12.04, Affective Disorders, specifically bipolar mood disorder." (Tr. 492). He also said that he considered whether Yeutter had impairments under Listing 12. 06 for anxiety

11

disorders, relying on Yeutter's testimony, counselor Dugger's notes, and the prescription for Ativan, and he opined that Yeutter's anxiety disorder likely did not "precisely satisfy the criteria for diagnosis." (Id.). He also noted that even after February 2004, Dr. Fareed's principal diagnosis was bipolar disorder. (Tr. 493).

Dr. England found that Dailey's November 2003 referral of Yeutter to Dr. Fareed was significant because Yeutter was experiencing a period of mania, which was an episode of decompensation[3] that required a 10-day hospitalization in the hospital's "Partial Program". (Tr. 255-260, 491). At the time, Yeutter's GAF score was low, 40-45, indicating serious symptoms and serious impairments in social, occupational or school functioning.

Dr. England stated that records since February 2004 indicated that Yeutter's use of alcohol was material to her mental health problems, and that preventing relapses had been a focus of her treatment since that time. (Tr. 493). Dr. England noted that the therapist, Dugger, had assessed Yeutter as having a GAF score of 65 in October 2003, and that Dr. Schroeder had assessed Yeutter as having a GAF score of 70 in October 2003, which would not indicate any serious mental health symptoms interfering with her functioning. (Tr. 491). In Dr. England's opinion, there did not appear to be any mental health issue prior to November 2003 that was not adequately managed and controlled. (Tr. 491).

Dr. England testified that in November 2003 and in 2004, Yeutter had hospitalizations for significant symptoms, but that before that time there was no onset of serious mental health symptoms that could not be adequately controlled by medication in

---

[3] "Decompensation" is defined as "the appearance or exacerbation of a mental disorder due to failure of defense mechanisms." Stedman's *Medical Dictionary* (27th ed. 2000).

the absence of alcohol use.  (Tr. 491).  Dr. Fareed consistently treated Yeutter for bipolar

mood disorder during 2004.  (Tr. 492).  Dr. England found it difficult to explain that although

Dr. Fareed diagnosed substance abuse disorder, Yeutter's counselor had not noted this

as a diagnosis.  (Tr. 493).  In Dr. England's opinion, since February 2004, Yeutter's alcohol

use was material.  (Tr. 493).  Thereafter, she had a number of relapses of alcohol abuse.

(Tr. 493).  Dr. England noted that through January 2004 her GAF scores had been in the

65 to 70 range with the brief exception of the hospitalization in November 2003, when her

GAF score was 40-50, and  which resolved with medication changes.  (Tr. 494).  Although

Yeutter's actual level of alcohol use was difficult to determine, it was sufficient to interfere

with work and could have interfered with medications after November 2003.  (Tr. 499).

**Vocational Expert Testimony**

A vocational expert witness also testified at the hearing, stating that an individual

of Yeutter's "age, education, and past work history, both as to exertional as well as skill

level," and transferred skills from Yeutter's previous employment, could perform Yeutter's

past work as a cashier/checker or waitress as performed in the national economy.  (Tr.

501).  The ALJ assigned no limitations based on Yeutter's symptoms of depression or

anxiety.  The ALJ asked the VE to assume a second condition, "that due to the use of

intoxicants such as alcohol that the person would, over a period of 10 months or so,

probably be absent due to hospitalizations and so forth probably for at least a month of that

time, what effect would that have on their ability to maintain employment."  The VE

responded that the worker would not be able to sustain employment.  (Tr. 501).  On cross-

examination, the VE was asked to assume that the "claimant's testimony is credible and

that she has a multitude of bad days . . .  when she is depressed and not functioning well,

13

would that have an impact on her employability?"   The VE responded, "Yes, she would be unemployable."

**THE ALJ'S DECISION**

The ALJ determined that Yeutter has not engaged in substantial gainful activity since her onset date of October 25, 2002.  He concluded that she suffers from severe impairments with and without the effects of drug abuse and alcoholism, which are commonly referred to as DA&A.  He found that Yeutter satisfied the Listing in 12.09 for "Substance Addiction Disorders" by way of Listing 12.04(A)(1) for "depressive syndrome;" that she has marked limitations in the following areas: activities of daily living; social functioning, concentration, persistence or pace; and that she has had two to three episodes of decompensation.  The ALJ concluded that Yeutter was disabled due to meeting the Listing requirements of 12.09 by way of Listing 12.04 *"at least through November 2003,"* which I understand him to mean from the date of the hearing back to November 2003.  (emphasis added).  The ALJ did not make an express finding of "disabled" for the period from the alleged date of onset, October 25, 2002, through November 2003, though a finding of "not disabled" for that period is implied in the ALJ's finding that Yeutter was not disabled absent DA&A during any of the claimed period.

Having determined that she was disabled under Listing 12.09, the ALJ next was required to consider whether Yeutter's DA&A was a material factor in her disability.  To do so, the ALJ had to consider Yeutter's abilities in the absence of DA&A.  The ALJ, relying on Dr. Graham's opinion and the opinions of other consultants, concluded that Yeutter did not meet any Listing in the absence of DA&A because Yeutter had only slight limitations in the following areas in the absence of alcohol abuse: activities of daily living; social

14

functioning; and concentration, persistence, and pace.  In addition, in the absence of alcohol abuse, the ALJ concluded that Yeutter would not have experienced any episodes of decompensation.

The ALJ determined that, absent alcohol abuse and/or dependence, Yeutter had the ability to perform light, unskilled work, with minor limitations.  She was unable to do fine manipulation and she was able to sit or stand with normal breaks for six hours of an eight-hour work period.   The ALJ also found that she was only minimally restricted in her ability to use judgment and to deal with others, and slightly limited in her ability to maintain attention, concentration and pace.  She could understand, remember, and carry out simple instructions.  Based on these findings, the ALJ concluded that Yeutter could perform her past work as a waitress and cashier, and that she was not disabled within the meaning of the Social Security Act.

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo.  Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995).  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from,

as well as supports, the Commissioner's decision. *Id.*; *Morse v. Shalala,* 16 F.3d 865, 870 (8th Cir. 1994). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### *"Disability" Defined*

An individual is considered to be disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). If the claimant argues that he has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

### *Sequential Evaluation*

In determining disability, the Act follows a sequential evaluation process. *See* 20 C.F.R. § 416.920. In engaging in the five-step process, the ALJ considers whether: 1) the claimant is gainfully employed; 2) the claimant has a severe impairment; 3) the impairment

16

meets the criteria of the "Listings"; 4) the impairment prevents the claimant from performing past relevant work; and 5) the impairment necessarily prevents the claimant from doing any other work.  *Id.*  If a claimant cannot meet the criteria at any step in the evaluation, the process ordinarily ends and the determination is one of no disability.  *Id.*  Even if the claimant meets all five criteria set forth above, in the event that the claimant suffers, or has in the past suffered from alcoholism or substance abuse, another step must be considered.

In 1996, Congress amended the statutory definition of "disability'" such that "'[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction . . . would . . .  be a contributing factor material to the Commissioner's determination that the individual is disabled.'"  Contract with American Advancement Act, Pub. L. No. 104-121, § 105(a)(1), 110 Stat. 847, 852 (1996) (codified a 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535.  The social security regulations require the Commissioner to assess whether alcoholism is a contributing factor material to the determination of disability only upon a determination that the claimant is disabled and there is medical evidence of alcoholism. 20 C.F.R. § 404.1535(a) (2005).  The Commissioner must assess whether the claimant would still be disabled if he or she stopped using alcohol.  20 C.F.R. § 404.1535 (b)(1). To that end, the Commissioner is directed to evaluate the claimant's current physical and mental limitations that are the basis for the disability determination and consider whether these limitations would remain in the absence of the claimant's alcohol use, and if there are any such limitations, whether any or all of the remaining limitations support a finding of "disabled" under the Act.  20 C.F.R. § 404.1535(b)(2).

The analytical framework is devised so that the Commissioner, or in this case the ALJ, can make a "materiality determination," that is, decide whether the claimant's

alcoholism is a significant contributing factor to his or her disability.  *See Rehder v. Apfel,* 205 F.3d 1056, 1060 (8th Cir. ,2000).  Alcoholism or drug abuse is "material" when the evidence establishes that the claimant would not be disabled if he or she abstained.  The burden of proving that alcoholism or drug addiction was not a contributing factor material to the disability determination falls on the claimant, and if an "ALJ is unable to determine whether substance use disorders are a contributing factor material to the claimant's otherwise-acknowledged disability, the claimant's burden has been met and an award of benefits must follow."  *Brueggemann v. Barnhart,* 348 F.3d 689, 693 (8th Cir. 2003) citations omitted.

Yeutter contends that the ALJ erred in failing to follow the analytical framework designed for DA&A cases, and in determining that alcohol was a contributing factor material to her disability.  This Court must determine whether the ALJ's decision is supported by substantial evidence on the record as a whole.  *Harris v. Barnhart,* 356 F.3d 926, 928 (8th Cir. 2004).  "Substantial evidence" is such evidence that a reasonable person would find adequate to support the ALJ's determination.  *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004).  In evaluating whether the ALJ's  determination satisfies the standard, the Court must consider all of the evidence that was before the ALJ but not re-weigh the evidence.  See *Vester v. Barnhart*,  416 F.3d 886, 888-889 (8th Cir. 2005).

The Commissioner's regulations outline how to account for substance use disorders in disability determination proceedings,[4] and the Eighth Circuit Court has determined that

---

[4]20 C.F.R. § 404.1535(b) describes the:

(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.

(1) The key factor we will examine in determining whether drug addiction or alcoholism is

18

an ALJ failure to follow the procedure may constitute legal error. *Id.* at 695. The ALJ "may not silently disregard" the regulations. *Id.* at 694, citing 20 C.F.R. § 404.1535 (mandating procedures for consideration of substance use disorders); 20 C.F.R. § 404.1527 (mandating procedures for evaluating physicians' opinions); 20 C.F.R. § 404.1520a (mandating procedures for evaluating mental illness). The regulations plainly require the existence of a "current disability determination" before the substance use disorders are even considered. I conclude that this was done by the ALJ in this case.

The inquiry at the first phase "concerns strictly symptoms, not causes, and the rules for how to weigh evidence of symptoms remain well established." *Brueggemann*, 348 F.3d at 694. If the claimant's impairments demonstrate that he or she is disabled, "then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent. . . .[T]he ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other." *Id.* at 694-95.

In this case, the ALJ determined that Yeutter had not engaged in substantial gainful activity since her onset date October 25, 2002. He concluded that she suffers from severe impairments including DA&A, depression, and disorders of the back and hips. He found that her DA&A satisfies the Listing in 12.09 for "Substance Addiction Disorders" by way of

_____

a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

19

Listing 12.04(A)(1) for depressive syndrome and (B) findings of marked limitations in the following: activities of daily living; social functioning; concentration, persistence or pace; and that she has had two to three episodes of decompensation.   The ALJ concluded that Yeutter was disabled due to meeting the Listing requirements of 12.09 (alcohol abuse /dependency) by way of Listing 12.04 (for depressive disorder) *"at least through November 2003."* I construe the date restriction to mean from November 2003 through the date of the hearing.  (emphasis added).

Having determined that she satisfied the requirements of Listing 12.09, the ALJ had to consider whether Yeutter's DA&A was a material factor in her disability.   To make this determination, the ALJ then was required to consider whether the serious impairments previously identified by him were sufficient to render her disabled under the Act.  First, the ALJ found that Yeutter does not meet any of the Listings in the absence of the DA&A. Next, the ALJ considered her residual functional capacity in light of her severe impairments that did not include the DA&A.

### RFC and Past Relevant Work

Residual functional capacity ("RFC") is defined as what Yeutter  "can still do despite . . . limitations."  20 C.F.R. §§ 404.1545(a), 416.945(a).  Residual functional capacity is an assessment based on all "relevant evidence," *id.*, including a claimant's description of limitations; observations by treating or examining physicians or psychologists, family, and friends; and medical records.  *Id.* §§ 404.1545(a)-(c), 416.945(a)-(c).  Thus, the ALJ must resolve any conflict in the medical evidence.  *Id.*  However, some medical evidence "'must support the determination of the claimant's [residual functional capacity], and the ALJ

20

should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  *Id.* at 712 (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)).

In Yeutter's case, the ALJ followed the proper analysis for determining Yeutter's RFC. The ALJ considered, among other evidence, the records from both treating and agency physicians, her therapist,  and her former employer.  See  *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000).  Before determining residual functional capacity, an ALJ first must evaluate the claimant's credibility.  In evaluating subjective complaints, an ALJ must consider, evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions.  *See Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984); *see also* § 404.1529.  Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.  *Polaski,* 739 F.2d at 1322.  The credibility of a claimant's subjective testimony is primarily for the ALJ, not a reviewing court, to decide. *Pearsall,* 274 F.3d at 1218.

The ALJ found Yeutter was "not fully credible."  He explained the credibility determination was based on the fact that "the claimant appears to believe that she is capable of working."  He noted that Yeutter accepted unemployment compensation benefits from March 2002 through December 2003.  The ALJ found Yeutter "put in a significant number of applications for jobs, and is still on call as a driver."

Having reviewed the testimony, I cannot find where Yeutter stated that she believes she is capable of working, and so I assume that the ALJ inferred that based on Yeutter's acceptance of the unemployment benefits through December 2003.   The record

demonstrates that Yeutter had applied for only two positions, which is not a number that I would call "significant." While Yeutter testified that she remains "on-call as a driver," she concedes that she has never been called, and the explanation of that status reveals that she simply was never formally fired, though she was asked to stop coming to work and was never called back. Her former employer indicated that she was too easily distracted while driving. Thus, her "on call" status does not appear to hold true potential for future gainful employment. For all these reasons, I conclude that the ALJ's credibility determination is not based on substantial evidence and does not conform to the analysis described in *Polaski v. Heckler*. However, rather than remand this matter for a credibility determination, I will assume that Yeutter's testimony is credible. Nevertheless, this assumption will not materially alter the outcome of the appeal.

Having discredited Yeutter's credibility, the ALJ concluded that Yeutter was able to perform light and unskilled work generally, allowing for standing six hours a day; sitting six hours a day; lifting and carrying twenty pounds occasionally and ten pounds frequently; avoiding more than occasional postural activities such as climbing ladders or ropes or exposure to other hazards involving height and open machinery. Taking all the evidence into consideration, I find that the ALJ properly determined the fourth step of the inquiry. *See Hutsell v. Massanari,* 259 F.3d 707, 711 (8th Cir. 2001).

The ALJ primarily relied on Dr. Graham's and Dr. Hohensee's opinions regarding Yeutter's mental and physical capabilities. The ALJ also found that Yeutter was treated with anti-depressants and received mental health counseling through Lutheran Family Services. The ALJ noted that "these counselors opined that the claimant had only moderate symptoms." He noted that she was treated by physicians at Midlands Family

22

Medicine with the anti-depressant Lexapro, to which she responded well, and the treatment notes reflected that she was doing well as long as she abstained from alcohol.  The ALJ noted that the psychological evaluation by Dr. Schroeder reflected that she was in a period of "slight" mania.

Although other health care providers make note of Yeutter's bipolar disorder diagnosis in records from 2002 and 2003, the ALJ's first mention of the bipolar diagnosis was at the time of her hospitalization in March 2004, which was accompanied by a relapse of alcohol abuse.  When Yeutter experienced episodic relapses of alcohol abuse and Ativan abuse in 2004, the ALJ determined that her activities of daily living, social functioning, concentration, persistence or pace became markedly restricted.  I agree that the medical records from 2004, when the DA&A relapses occurred, and her own testimony from 2004, indicate that Yeutter was having significantly more difficulty in the activities of daily living; social functioning; and pace, persistence, and concentration throughout 2004 than she demonstrated in 2002 and the first three quarters of 2003.  The ALJ's analysis of materiality was more thoughtful than a simple finding, as suggested by the Plaintiff, that her psychological impairments (or mental illness) were exacerbated by her alcohol intake. The ALJ stated that he was not persuaded that the hospitalizations would have occurred had Yeutter abstained from alcohol.

The ALJ found that absent DA&A, Yeutter had the residual functional capacity to do light, unskilled work with minor physical limitations.  He determined that absent DA&A, Yeutter had only slight limitations in the activities of daily living, and social functioning. While abstaining, Yeutter could understand, remember, and carry out simple instructions; she was able to sit or stand with normal breaks for six hours of an eight-hour work period;

23

she was only minimally restricted in her ability to use judgment and to deal with others; and she was slightly limited in her ability to maintain attention, concentration, and pace.

Based on the findings of only slight limitations[5] in activities of daily living, social functioning, and attention, concentration and pace, the ALJ concluded that Yeutter could perform her past work as a waitress and cashier, and that she was not disabled within the meaning of the Social Security Act. I agree. There is no evidence that Yeutter experienced marked limitation in her abilities at any time before November 2003, and, thereafter, substantial evidence supports the conclusion that alcohol use and Ativan abuse were material factors in periods of decompensation and caused the marked limitations in her ability to function.

I conclude that the ALJ properly considered the case within the analytical framework required by 20 C.F.R. § 404.1535. To find that Yeutter satisfied the Listing in 12.09 by way of 12.04 does not compel the conclusion that, absent alcohol and drug abuse, Yeutter still would be sufficiently restricted to qualify as disabled under the Act. Indeed, it appears that Yeutter was functioning relatively well with the assistance of prescription medications, medical oversight for her bipolar disorder and depression, and weekly counseling throughout 2002 and into November 2003. Certainly she had a few very bad days with feelings of depression and sadness on the rise, which are documented in the medical records, but there is substantial evidence in the medical and therapy records that when she

---

[5] The criteria contained in the Listings establish "functional limitations" resulting from mental disorders that "are incompatible with the ability to do any gainful activity." § 12.00(A). Thus, "a limitation is considered "marked" if it is "more than moderate but less than extreme." *Stormo v. Barnhart,* 377 F.3d 801, 808 (8th Cir. 2004) citing § 12.00(C)(in discussion on organic mental disorder.)

24

abstained from DA&A, she was able, with the timely adjustment of her medications, to manage her mental health and function with slight to moderate limitations in her functioning. This evidence supports a finding of "not disabled." See *Sultan*, 368 F.3d at 864.

I conclude that there is substantial evidence in the record as a whole to support the ALJ's determination. While it is true that Yeutter's medical and mental health counseling records demonstrate that she has severe impairments including bipolar disorder, exhibited by periods of depression and mania, the record also demonstrates that, in the absence of drug and alcohol abuse, she was managing her mental health well with the support of her health care providers and appropriate prescription medications. The records from her primary health care providers, Nurse Practitioner Dailey and Dr. Brittan; from the consultants, Dr. Schroeder and Dr. Graham; and from her therapist demonstrate that she was coping well, responding to adjustments in her medication, and committed to therapy sessions that were assisting her.

I conclude that substantial evidence supports the ALJ's determination that, in the absence of DA&A, Yeutter had an RFC to perform light duty, unskilled work with only slight limitations in daily living, in social functioning, in concentration, persistence or pace. The ALJ's reliance on the opinions of the medical expert, Dr. England, and on the VE in concluding that, in the absence of alcohol and drug abuse, Yeutter had the residual functional capacity to perform light and unskilled work generally is based on substantial evidence, as is the ALJ's conclusion that Yeutter is able to perform her past relevant work as a waitress and a cashier.

**CONCLUSION**

The Court has considered all of the evidence and is satisfied that the ALJ appropriately considered Yeutter's severe impairments, including her mental illness, together with her history of alcohol and drug abuse, and that the ALJ found sufficient credible evidence to conclude that Yeutter is not disabled as defined in the Act, apart from her alcohol and drug abuse. For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed and the appeal is denied. Judgment in favor of the Defendant will be entered in a separate document.

DATED this 9th day of November, 2006.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

26